LEWIS LOWDEN, ROBERT
LOWDEN, *personal representative
of the estate of Jean Lowden*,

        Plaintiffs,

                                     Case Number 09-11209-BC

v.                                        Honorable Thomas L. Ludington

COUNTY OF CLARE, LAWRENCE
KAHSIN, CALVIN WOODSTOCK,

        Defendants.

_____/

# ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS OR FOR JUDGMENT ON THE PLEADINGS, DENYING IN PART AND DENYING WITHOUT PREJUDICE IN PART PLAINTIFFS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS, DENYING WITHOUT PREJUDICE ATTORNEY GENERAL'S MOTION FOR SUMMARY JUDGMENT, AND GRANTING LEAVE TO FILE BRIEFS REGARDING DECLARATORY RELIEF

The claims in this case highlight the delicate balance between "[t]he ability of government . . . to shut off discourse solely to protect others from hearing it," *Cohen v. California*, 403 U.S. 15, 21 (1971), and the highly valued right to free speech embodied in the First Amendment. In the last several years, to spread the message of their church, members of the Westboro Baptist Church have picketed funerals of American soldiers by, for example, holding signs that say, "Thank God for Dead Soldiers." *See generally Phelps-Roper v. Strickland*, 539 F.3d 356, 359 (6th Cir. 2008). Members of the Westboro Baptist Church believe that American soldiers are being killed in Iraq and Afghanistan because America tolerates homosexuality. *Id.*

In 2006, the U.S. Congress enacted the Respect for America's Fallen Heroes Act, 38 U.S.C. § 2413, followed by the Respect for the Funerals of Fallen Heroes Act, 18 U.S.C. § 1388. The first

act prohibits demonstrations within federal cemeteries without prior approval; within 300 feet of a federal cemetery sixty minutes before, after, and during a funeral; and within 150 feet of a route of ingress or egress sixty minutes before, after, and during a funeral. 38 U.S.C. § 2413(a). The second act applies outside of federal cemeteries and prohibits disruption of military funerals within 300 feet of a military funeral sixty minutes before, after, and during the funeral; and within 150 feet of a route of ingress or egress sixty minutes before, after, and during the funeral. 18 U.S.C. § 1388(a). A violation of either federal statute is punishable by a fine, up to one year imprisonment, or both. 18 U.S.C. §§ 1387, 1388(b).

Soon after enactment of the federal laws, many states, including Michigan, enacted laws of their own. *See* Mich. Comp. Laws § 750.167d. The Michigan funeral protest statute applies to funerals, memorial services, viewings of deceased persons, funeral processions, and burials. *Id.* The statute prohibits within 500 feet of each of those events, continuing to "[m]ake loud and raucous noise . . . after being asked to stop," making a "statement or gesture that would make a reasonable person . . . feel intimidated, threatened, or harassed," and engaging in conduct that the person "knows or should reasonably know will disturb, disrupt, or adversely affect the funeral [or related event]." *Id.* § 750.167d(1).[1] A violation of the statute is a felony and punishable by up to two years

---

[1] The Michigan funeral protest statute provides in full:

(1) A person shall not do any of the following within 500 feet of a building or other location where a funeral, memorial service, or viewing of a deceased person is being conducted or within 500 feet of a funeral procession or burial:

(a) Make loud and raucous noise and continue to do so after being asked to stop.

(b) Make any statement or gesture that would make a reasonable person under the circumstances feel intimidated, threatened, or harassed.

(c) Engage in any other conduct that the person knows or should reasonably know will disturb, disrupt, or adversely affect the funeral, memorial service, viewing of the deceased person, funeral procession, or burial.

imprisonment.  *Id.* §§ 750.167(2), 750.168.

In this case, Plaintiffs challenge the "adversely effect" language of the Michigan statute, its application to an area within 500 feet of a funeral or related event, and its application to funeral processions.  Plaintiffs' claims arise from the arrests of Lewis and Jean Lowden during a funeral procession for an American soldier and close family friend of the Lowdens.  En route from the church to the cemetery with a procession flag on their vehicle, the Lowdens were arrested for violating the Michigan funeral protest statute when their vehicle had handmade political signs in the windows that were critical of government policies and then-U.S. President George W. Bush.

I

On April 1, 2009, Plaintiffs Lewis Lowden and Robert Lowden ("Plaintiffs") filed the instant complaint against Defendants Clare County ("the County"), and Sheriff Deputies Lawrence Kahsin and Calvin Woodcock ("Deputies Kahsin and Woodcock").  Plaintiff Robert Lowden is the personal representative of the estate of Jean Lowden.  Plaintiffs allege facial and as-applied challenges to Mich. Comp. Laws § 750.167d ("the Michigan funeral protest statute"), based on the arrest of Lewis and Jean Lowden ("the Lowdens") during a funeral procession on September 26, 2007.

Plaintiffs' complaint alleges four counts pursuant to 42 U.S.C. § 1983, including: (1) violations of the First Amendment based on overbreadth; (2) violations of the Due Process Clause of the Fourteenth Amendment based on vagueness; (3) violations of the Fourth Amendment; and (4) municipal liability for violations of the First, Fourth, and Fourteenth Amendments.  Plaintiffs seek a declaration that the Lowdens' First, Fourth, and Fourteenth Amendment rights were violated

---

(2) A person who violates subsection (1) is a disorderly person and is guilty of a felony punishable as provided under section 168.

Mich. Comp. Laws § 750.167d.

by Defendants; a declaration that the Michigan funeral protest statute is unconstitutional on its face; compensatory damages for, inter alia, attorney's fees incurred to defend criminal charges and fees to recover the Lowdens' van from an impound lot; and costs and attorney's fees pursuant to 42 U.S.C. § 1988.

On March 17, 2010, the Court held a hearing on three dispositive motions now before the Court. First, on July 30, 2009, Deputies Kahsin and Woodcock and the County filed a motion to dismiss or for judgment on the pleadings [Dkt. # 20]. Defendants seek dismissal of Plaintiffs' claims against Deputies Kahsin and Woodcock based on qualified immunity, dismissal of Plaintiffs' facial challenges because the County and Deputies Kahsin and Woodcock are not proper Defendants to a facial challenge, and dismissal of Plaintiffs' municipal liability claim against the County based on the absence of a municipal policy. Plaintiffs filed a response [Dkt. # 23] on August 20, 2009; and Defendants filed a reply [Dkt. # 27] on August 31, 2009.

In lieu of a hearing on Defendants' motion on September 24, 2009, the parties attended a status conference. At the conference, it was resolved that a forty-five day stay of the scheduling order was justified to allow the parties an opportunity to investigate settlement while still framing the constitutional issues. A followup conference was scheduled for, and held on, November 20, 2009. At the conference, Plaintiffs' counsel expressed the intent to imminently file a motion for judgment on the pleadings. The parties agreed that the most expeditious and cost-effective route to resolution of the case would favor holding a hearing on Defendants' pending motion in conjunction with Plaintiffs' anticipated motion.

Subsequently, Plaintiffs filed a motion for partial judgment on the pleadings [Dkt. # 31] on November 24, 2009. Plaintiffs seek a declaration that the Michigan funeral protest statute is

unconstitutional on its face and challenge Deputies Kahsin and Woodcock's assertions of qualified immunity. In light of the relief Plaintiffs sought, a determination that the Michigan statute is unconstitutional on its face, Michigan Attorney General Michael Cox was invited to intervene within sixty days pursuant to 28 U.S.C. § 2403(b) to defend the constitutionality of the Michigan statute.

On January 29, 2010, the Attorney General accepted the invitation to intervene and filed a motion for summary judgment [Dkt. # 39]. The briefing of Plaintiffs' motion and the Attorney General's motion overlaps. In sum, Defendants filed a response to Plaintiffs' motion [Dkt. # 42] on February 8, 2010; Plaintiffs filed a combined reply to Defendants' response and a response to the Attorney General's motion [Dkt. # 43] on February 12, 2010; the Attorney General filed a combined response to Plaintiffs' motion and reply to Plaintiffs' response to its motion [Dkt. # 47] on February 25, 2010; and Plaintiffs filed a reply to the Attorney General's response to their motion [Dkt. # 51] on March 4, 2010.

As will be further explained below, Deputies Kahsin and Woodcock are not entitled to qualified immunity on Plaintiffs' Fourth Amendment cause of action or as-applied Fourteenth and First Amendment causes of action. However, they are entitled to qualified immunity on Plaintiffs' Fourteenth and First Amendment facial challenges to the Michigan funeral protest statute because it was not clearly established that the statute is unconstitutional, if it is in fact unconstitutional. In light of the resolution of Plaintiffs' facial challenges to the statute on the basis of qualified immunity, it appears that the Court may not reach the question of whether the Michigan statute is unconstitutional on its face. The propriety of the Court exercising its discretion to determine the constitutionality of the statute has not been framed or briefed. Thus, the Court will invite the parties to brief the issue. Finally, the County is not entitled to dismissal of Plaintiffs' claims against it

because Plaintiffs plead sufficient facts to plausibly suggest an actionable municipal policy.

II

The applicable standard of review varies as to each of the pending motions and each will be explained prior to review of the facts. First, Defendants have framed their motion as a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), and a motion for judgment on the pleadings brought pursuant to Federal Rule of Civil Procedure 12(c). Similarly, Plaintiffs' motion for partial judgment on the pleadings is brought pursuant to Rule 12(c). The parties agree that "the legal standards for adjudicating Rule 12(b)(6) and Rule 12(c) motions are the same." *Lindsay v. Yates*, 498 F.3d 434, 437 n.4 (6th Cir. 2007).

In considering a Rule 12(c) motion, "all of the well pleaded factual allegations in the adversary's pleadings are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false." 5C Wright & Miller, Federal Practice & Procedure § 1368. Thus, when considering a Rule 12(c) motion brought by a defendant, "[t]he court must construe the complaint in a light most favorable to the plaintiff." *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998). "Factual allegations must be enough to raise a right to relief above a speculative level, on the assumption that all the allegations in the complaint are true. . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, - - - U.S. - - - -, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). "Facial plausibility" requires the plaintiff to include sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In contrast, when the plaintiff moves for judgment on the pleadings, the motion should be granted if, "on the undenied facts alleged in the complaint and assuming as true all the material allegations of fact in the answer, the plaintiff is entitled to judgment as a matter of law." *See United States v. Blumenthal*, 315 F.2d 351, 352 (3d Cir. 1963); *Hous. Auth. Risk Retention Group, Inc. v. Chicago Hous. Auth.*, 378 F.3d 596, 600 (7th Cir. 2004). In other words, if a defendant's answer admits, alleges, or fails to deny facts which, taken as true, would entitle a plaintiff to relief on one or more claims supported by the complaint, then the plaintiff's Rule 12(c) motion should be granted. *See Nat'l Metro. Bank v. United States*, 323 U.S. 454, 456-57 (1945).

When a court is presented with a Rule 12(b)(6) or 12(c) motion, "it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss, so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). If other "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Plaintiffs contend that the Court should exclude police photographs and a police incident report that Defendants submitted as exhibits to their motion. Defendants assert that the evidence is referred to in Plaintiffs' complaint and is properly considered. However, at the hearing, Defendants conceded that the evidence is not material at this juncture. The same conclusion is reached by the Court and the evidence will be excluded on that basis.

Finally, the Attorney General has brought a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). Generally, under Rule 56(c), a court must review all of the pleadings and evidence in the record to determine whether it can conclude that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

However, the Attorney General asserts that the factual circumstances surrounding the Lowdens'

arrests are not material to a determination of whether the Michigan funeral protest statute is

unconstitutional on its face. Plaintiffs do not dispute this proposition, and Defendants, whether

wisely or not, have disclaimed any interest in whether or not the Michigan statute is constitutional.

Under these circumstances, the facts surrounding the Lowdens' arrests need not be considered in

a discussion of the constitutionality of the statute. *See, e.g.*, *Forsyth County v. Nationalist*

*Movement*, 505 U.S. 123, 129 (1992) (noting that a statute "may be subject to facial review and

invalidation, even though its application in the case under consideration may be constitutionally

unobjectionable.").

## III

On September 26, 2007, the Lowdens traveled to Clare County in their 1995 white Dodge

Ram van to attend the funeral of Corporal Todd Motley, a soldier who was killed in action in Iraq

while serving in the United States Army. The funeral and procession through the downtown area

of the town of Harrison was widely publicized and hundreds of onlookers lined the streets to pay

their respects to Corporal Motley. The windows of the Lowdens' van had signs taped to the inside

that were similar to bumper stickers and visible to observers outside the van. The stickers contained

statements that were political in nature, and most were critical of then-U.S. President George W.

Bush and his administration's policies. A funeral flag, identifying the vehicle as a participant in the

procession, was placed either on the outside of the van or on the inside dashboard, like many other

vehicles.

At approximately 2:30 p.m., Deputy Kahsin was advised by a fellow officer at a different

location that there was a van in the funeral procession with anti-government protest signs in its windows. When the Lowdens' van reached Deputy Kahsin's location, Deputy Kahsin ordered Lewis Lowden, who was driving, to pull over, Lewis Lowden pulled over as directed, and Deputy Woodcock arrived on the scene to assist Deputy Kahsin. Deputy Kahsin asked Lewis Lowden why he had signs in his windows, Lewis Lowden replied that it was his First Amendment right to criticize the government, Deputy Kahsin then asked both Jean and Lewis Lowden if they were protesting, and the Lowdens both replied that they were not protesting and that they were there to attend the funeral because they were like family to Corporal Motley.

Plaintiffs' complaint contains the following additional allegations: The Lowdens had known Corporal Motley and his family for approximately fifteen years. In particular, Jean Lowden homeschooled Corporal Motley in high school, and Lewis Lowden took Corporal Motley on fishing and camping trips in the summer. The Lowdens were devastated by Corporal Motley's death. Corporal Motley's family invited the Lowdens to attend and to participate in Corporal Motley's funeral service, including the funeral procession. Many onlookers waved American flags and displayed signs thanking Corporal Motley for his service to our country.

Upon arriving at the church service, the Lowdens were asked if they intended to drive in the funeral procession from the church to the burial site, the Lowdens said yes, and they were directed to a parking lot for all the procession vehicles. No comments were made to the Lowdens about the homemade signs on their van, which Lewis Lowden had been taping to the inside windows of the van for years. Following the church service, the Lowdens entered the funeral procession and proceeded slowly in their vehicle for approximately two miles. When Deputy Kahsin stopped the Lowdens, he had not been advised by anyone of a disruption or disturbance caused by the Lowdens'

participation in the funeral procession, nor did any such disruption or disturbance occur.

Ultimately, the Lowdens were detained in jail for approximately twenty-four hours before being released on personal recognizance. Jean Lowden, who was fifty-six years old, had serious medical conditions that made her arrest and detention physically painful and distressing. The Lowdens were both forced to endure the humiliation of being arrested in the middle of the funeral procession, and they could not attend the burial service of Corporal Motley as they had planned. The criminal charges against the Lowdens were eventually dismissed without prejudice.

## IV

Whether Deputies Kahsin and Woodcock are entitled to qualified immunity is a question that was first framed by their motion filed on July 30, 2009. While Defendants have certainly been accommodating as to the timing of the resolution of their motion, Deputies Kahsin and Woodcock are entitled to consideration of the defense without further delay. After consideration of the qualified immunity defense, whether the Court should grant declaratory relief regarding the constitutionality of the Michigan funeral protest statute will be considered, followed by whether Plaintiffs can proceed on any municipal policy claims against the County.

## A

"Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation." *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The privilege serves the purpose of, early in litigation, preventing suits from progressing because qualified immunity is *immunity* from suit, not merely a defense to liability. *See id.* at 200-201. Qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have known." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2001) (citation omitted).

The Sixth Circuit undertakes a three step analysis to determine whether an official is entitled to immunity:

> First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.

*Id.* at 901. *See Pearson v. Callahan*, - - - U.S. - - - -, 129 S. Ct. 808, 818 (2009) (finding that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

With regard to the second step, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citations omitted). *See Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir. 1993) ("In determining whether a constitutional right is clearly established, the court must first look to decisions of the U.S. Supreme Court, then to decisions of the Sixth Circuit, and, finally to decisions of other circuits."). "This

standard requires the courts to examine the asserted right at a relatively high level of specificity," and "on a fact-specific, case-by-case basis." *Cope v. Heltsley*, 128 F.3d 452, 458-59 (6th Cir. 1997).

Generally, there are two ways in which a plaintiff may show that "officers were on notice that they were violating a 'clearly established' constitutional right." *Lyons v. City of Xenia*, 417 F.3d 565, 579 (6th Cir. 2005). First, "where the violation was sufficiently 'obvious' under the general standards of constitutional care . . . the plaintiff need not show 'a body' of 'materially similar' case law." *Id.* (quoting *Brousseau v. Haugen*, 543 U.S. 194, 199 (2004)). Second, the violation may be shown "by the failure to adhere to a 'particularized' body of precedent that 'squarely govern[s] the case. . . .'" *Id.* (quoting *Brousseau*, 543 U.S. at 201).

In general, Defendants contend that this is not an "obvious case," in which the general standards of constitutional care would have given Deputies Kahsin and Woodcock "fair notice" that their conduct was unlawful, nor is there a single case or body of cases that squarely govern the circumstances of this case. In contrast, Plaintiffs assert that the constitutional law in existence at the time of the Lowdens' arrest made it sufficiently clear that the Michigan funeral protest statute was unconstitutional such that it was unreasonable for Deputies Kahsin and Woodcock to rely on the statute in making an arrest and to arrest the Lowdens under the particular circumstances.

Plaintiffs assert that officers are not entitled to qualified immunity when they unreasonably rely on unconstitutional statutes, even if the particular statute in question has not been previously so adjudicated. Plaintiffs rely primarily on *Carey v. Nevada Gaming Control Bd.*, 279 F.3d 873, 879-82 (9th Cir. 2002) and *Lawrence v. Reed*, 406 F.3d 1224, 1231-33 (10th Cir. 2005). In *Carey*, the plaintiff brought a Fourth Amendment claim after being arrested for violating a Nevada "stop-and-identify" statute. 279 F.3d at 879. The court found that the defendant-officer had probable

-12-

cause to arrest the plaintiff, but also that the plaintiff's "constitutional claim does not stem from an absence of probable cause to arrest, but from the alleged unconstitutionality of the statutes justifying the arrest." *Id.* at 879-80 (quotations omitted). The court determined that the defendant was not entitled to qualified immunity because "a reasonable officer in [the defendant's] position would have known that Carey had a clearly established Fourth Amendment right not to identify himself, and that the Nevada statutes at issue, like the statutes in [two other Ninth Circuit cases], were unconstitutional to the extent they allowed Carey to be arrested for exercising his rights." *Id*. at 881. The court also noted that the U.S. Supreme Court has "consistently recognized that a person detained pursuant to *Terry* "is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest." *Id.* (collecting U.S. Supreme Court cases).

Plaintiffs assert that the same approach was followed by the Tenth Circuit in *Lawrence v. Reed*, in which the plaintiff sued a police chief for "seizing her property without a warrant or a hearing." 406 F.3d at 1229. The police chief claimed he was entitled to qualified immunity because he acted pursuant to the city's "derelict vehicle" ordinance. *Id.* at 1231. The court rejected that defense because the police chief "should have known that the ordinance was unconstitutional." *Id.* at 1233. The court explained that "some statutes are so obviously unconstitutional that we will require officials to second-guess the legislature and refuse to enforce an unconstitutional statute – or face a suit for damages if they don't." *Id.* The court cited several cases, including a Tenth Circuit case, that established that a state must provide an individual with notice and a hearing when it deprives an individual of property by impounding a vehicle. *Id.*

Plaintiffs contend that the Sixth Circuit has adopted the same reasoning in *Leonard v. Robinson*, 477 F.3d 347 (6th Cir. 2007). In *Leonard*, the plaintiff was arrested for using the phrase

"God damn" at a township board meeting and brought a claim for unlawful arrest in violation of the probable cause requirement of the Fourth Amendment. *Id*. at 352. The defendant police officer asserted the qualified immunity defense, citing several statutes the plaintiff allegedly violated. *Id*. at 356-59. The Sixth Circuit decided against the officer, holding that "the laws cited by [the defendant] are either facially invalid, vague, or overbroad when applied to speech . . . at a democratic assembly where the speaker is not out of order." *Id.* at 356. While the court noted that "no reasonable police officer would believe" that the laws were constitutional, it only considered an as-applied challenge. *Id*. at 359.

Deputies Kahsin and Woodcock contend that Plaintiffs' Fourteenth and First Amendment facial challenges based on vagueness and overbreadth, respectively, address the drafting or precision of the language of the challenged statute and are matters considered by a legislative body, not law enforcement officers. They rely on *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 894 F.Supp. 1129, 1132 (S.D. Ohio 1995) ("The law makers not the law enforcers are the proper defendants in this type of suit."), rev'd on other grounds, 92 F.3d 1412 (6th Cir. 1996). Deputies Kahsin and Woodcock contend that they have no "particular interest in the contested statute," except "for the sake of knowing what the law is." Deputies Kahsin and Woodcock assert that they are "charged to enforce laws until and unless they are declared unconstitutional," although they acknowledge "the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *Michigan v. DeFillipio*, 443 U.S. 31, 38 (1979).

In any event, Deputies Kahsin and Woodcock are entitled to qualified immunity on Plaintiffs' facial challenges because it was not clearly established that the Michigan statute is

unconstitutional and entirely unenforceable. In contrast, Deputies Kahsin and Woodcock are not entitled to qualified immunity on Plaintiffs' as applied claims because viewing the complaint in the light most favorable to Plaintiffs, it was clearly established that enforcing the Michigan statute in the factual circumstances that are alleged violated Plaintiffs' constitutional rights. Plaintiffs' Fourth, Fourteenth, and First Amendment claims will each be considered in turn.

1

Under the Fourth Amendment, "probable cause" requires officers to determine "whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information [are] sufficient to warrant a prudent man in believing that the [subject] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (citations omitted). Deputies Kahsin and Woodcock maintain that they had probable cause to arrest the Lowdens for violating the Michigan funeral protest statute. Their papers do not explain the facts that are material to a determination of probable cause and they did not further inform the Court at the hearing.

Nevertheless, Deputies Kahsin and Woodcock concede that "Plaintiffs have stated a claim with respect to . . . the absence of probable cause and that genuine issues of material fact exist." [Dkt. # 26]. *See also Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995) ("[T]he existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible.") (citation omitted). Based on Deputies Kahsin and Woodcock's concession and the clearly established general rule that probable cause is required for a lawful warrantless arrest, Deputies Kahsin and Woodcock are not entitled to qualified immunity or dismissal of Plaintiffs' Fourth Amendment claims.

The Due Process Clause of the Fourteenth Amendment provides the foundation for the vagueness doctrine. *Columbia Natural Res. v. Tatum*, 58 F.3d 1101, 1105 (6th Cir. 1995) (citing *Chapman v. United States*, 500 U.S. 453, 464 (1991)). "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The "degree of vagueness that the Constitution tolerates . . . depends in part on the nature of the enactment," and "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982). Where a vague criminal law may have an improper chilling effect on activity protected by the First Amendment, "a more stringent vagueness test should apply." *Id.* "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (quotation and alterations omitted).

The Supreme Court has stated that "the most meaningful aspect of the vagueness doctrine is . . . the requirement that a legislature establish minimal guidelines to govern law enforcement." *Smith v. Goguen*, 415 U.S. 566, 574 (1974); *see also Grayned*, 408 U.S. at 108-09 (noting that a vague law "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis"); *Kolender v. Lawson*, 461 U.S. 352, 358 (1983); *Leonardson v. City of East Lansing*, 896 F.2d 190, 198 (6th Cir. 1990). The Due Process Clause does not permit legislatures to "so abdicate their responsibilities for setting the standards of a criminal law," thereby "entrusting lawmaking to the moment-to-moment judgment of the policeman

on his beat." *Smith*, 415 U.S. at 575 (quotation omitted). In other words, "[t]he Constitution does not permit the legislature to set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999).

Additionally, the fundamental "notice" requirement of due process condemns any statute with terms so vague that ordinary people lack fair warning of what conduct is prohibited. *Grayned*, 408 U.S. at 108. The standard for vagueness is whether " a person of ordinary intelligence could identify the applicable standard for inclusion and exclusion." *Id.* Mathematical precision is not required. *Id.* at 110.

Plaintiffs contend that Deputies Kahsin and Woodcock are not entitled to qualified immunity on Plaintiffs' facial Fourteenth Amendment challenge because from the moment Michigan's funeral protest statute was enacted, there was no question that the "adversely affect" clause was unconstitutionally vague. Plaintiffs assert that the Supreme Court's decisions in *Coates v. City of Cincinnati*, 402 U.S. 611, 614-16 (1971), and *Smith*, 415 U.S. at 573-76, clearly establish that the legislature may not set unascertainable, subjective standards of conduct and leave it to individual police officers to decide whom to arrest. Furthermore, Plaintiffs assert that under *Grayned*, 408 U.S. at 109, and *Hoffman Estates*, 455 U.S. at 498-99, it is clearly established that the void-for-vagueness test is most stringent when a criminal law with severe penalties threatens to inhibit the exercise of free expression. Plaintiffs assert that these cases clearly establish the contours of the vagueness doctrine and that the Michigan statute's prohibition on conduct that "adversely affects" a funeral event is so lacking in practical criteria that a reasonable officer could not have concluded that it could be constitutionally enforced under any circumstances.

-17-

Deputies Kahsin and Woodcock reiterate the unique argument that the vagueness doctrine is "concerned with the drafting of statutory text," and is "only collaterally related to the concerns of law enforcement officers." They assert that there is nothing in the history of the Michigan funeral protest statute or the case law to suggest that a presumption of constitutional validity would not apply. In other words, they assert that nothing would have given them notice that the statute could not be enforced against the Lowdens on September 26, 2007.

In *Coates*, the U.S. Supreme Court invalidated on vagueness grounds a city ordinance that made it a crime for three or more persons to assemble on a sidewalk and "there conduct themselves in a manner annoying to persons passing by." 402 U.S. at 611 (quotation omitted). The Court noted that "[c]onduct that annoys some people does not annoy others," and concluded that the ordinance was vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Id*. at 614. Consequently, "men of common intelligence must necessarily guess at its meaning," and "conduct themselves so as not to annoy any police officer or other person who should happen to pass by." *Id*. (quotation omitted).

Similarly, in *Smith*, the Supreme Court held void for vagueness a Massachusetts law that made it a crime to "treat[] contemptuously the flag of the United States." 415 U.S. at 568-69 (quotation omitted). Noting that there were "widely varying attitudes and tastes for displaying something as ubiquitous as the United States flag," the Court found that the prohibition on "contemptuous" treatment of a flag failed to draw reasonably clear lines between the kinds of treatment of a flag that are criminal and those that are not. *Id*. at 574. The Court relied on *Coates* and held that the "absence of any ascertainable standard for inclusion and exclusion . . . offends the

-18-

Due Process Clause." *Id.* at 578.

Plaintiffs assert that the Michigan funeral protest statute provides no meaningful guidelines to police officers charged with enforcing it. They suggest that some officers are likely to think that the statute prohibits peaceful picketing on public sidewalks, whereas others will think that any conduct upsetting to a member of the deceased's family violates the statute. Some officers will assume the statute does not apply to the conduct of invited guests, whereas others could conclude that the statute's coverage extends to unconventional attire, nervous laughter, and inappropriate eulogies. Plaintiffs assert that the breadth of the statutory language against conduct that adversely affects a funeral is "an obvious invitation to discriminatory enforcement against those whose . . . ideas, . . . lifestyle, or . . . physical appearance is resented by the majority of their fellow citizens." *Coates*, 402 U.S. at 616.

Plaintiffs further assert that the Michigan funeral protest statute's ban on conduct that "adversely affects" a funeral does not establish an ascertainable standard because there is no settled understanding as to what constitutes a funeral or what makes a funeral "better" or "worse" than it would have otherwise been. Plaintiffs assert that it is impossible for someone at or near a funeral to know or even guess what will "adversely affect" it. For example, when there is intra-family conflict, would a family member "adversely affect" the funeral when another family member is upset by the other person's presence? In other words, people of common intelligence must necessarily guess at the statute's meaning, and as a result are left without any principle for determining when their conduct becomes unlawful.

In defense of the statute, the Attorney General advances a "controlling standard of conduct" test based on *United States v. Williams*, 892 F.2d 1044 (table), 1990 WL 811 (6th Cir. Jan. 8, 1990).

-19-

In *Williams*, "loud, boisterous, and unusual noise and . . . any behavior which is otherwise disruptive to the VA hospital's normal functioning" was prohibited. 1990 WL 811, at *2. The court distinguished the circumstances from those confronted in *Coates* because "the controlling standard of conduct is reasonably clear: if the conduct would tend to disturb the routine operations of a VA hospital, such conduct is prohibited." *Id.*

The Attorney General insists that the language of the Michigan funeral protest statute is sufficiently specific when viewed within the narrow context of the well-accepted cultural understanding of funerals and related events. The Attorney General asserts that it is easily understood therefore what conduct would tend to disturb, disrupt, or adversely affect the solemnity and procedures of a funeral-related event, or intimidate, threaten, or harass a funeral attendee. The Attorney General further suggests that the meaning of the individual words within the statute can be extrapolated from the purpose of the statute as a whole. In particular, the Attorney General asserts that subsection (a) which applies to "loud and raucous noise," and subsection (b) which addresses activities that would intimidate, threaten, or harass funeral attendees, informs the understanding of the language in subsection (c) – "disturb, disrupt, or adversely affect." The Attorney General ultimately proposes that the Michigan statute asks "whether the funeral event is, or is about to be, disrupted." Additionally, the Attorney General maintains that the statute does not rely on conduct having an "adverse affect" on a funeral attendee alone, but an "adverse affect" on the funeral event itself. In other words, it is "the very process itself – and the solemnity attached to it – that is protected."

Plaintiffs contend that the words "solemnity" and "procedures" are necessarily added by the Attorney General in an effort to narrow the scope of the statute. Plaintiffs emphasize that "federal

courts are without power to adopt a narrowing construction of a state statute unless such a construction of a state statute is reasonable and readily apparent." *Boos v. Barry*, 485 U.S. 312, 329 (1988) (citing *Grayned*, 408 U.S. at 110); *Forsyth*, 505 U.S. at 131 (noting that a federal court may consider authoritative constructions of the statute, and potentially implementation by the regulating authority).  Plaintiffs persist in their contention that while the concept of a funeral may be reasonably understood, opinions about what type of conduct "adversely affects" a funeral will vary widely.

Plaintiffs highlight that the statute is not limited, as the Attorney General suggests, to speech that "disturbs" or "disrupts" a funeral.  It also makes it illegal to "adversely affect" a funeral.  "Every word in the statute is presumed to have meaning, and [courts] must give effect to all the words to avoid an interpretation which would render words superfluous or redundant." *Walker v. Bain*, 257 F.3d 660, 667 (6th Cir. 2001).  Plaintiffs explain that the Michigan Legislature intended its restrictions to go beyond disturbances and disruptions by its use of the additional language of "adversely affect."  Thus, under the statute, a person who engages in speech that does not actually disturb or disrupt a funeral, but nonetheless causes negative emotional reactions because of its content and thereby "adversely affects" it, is guilty of a felony.

The Attorney General also suggests that a scienter requirement may save a statute that is otherwise unconstitutionally vague.  *See Screws v. United States*, 325 U.S. 91, 101-03 (1945); *Robinson v. Waterford*, 883 F.2d 75 (table), 1989 WL 94569 (6th Cir. Aug. 18, 1989).  In *Robinson*, the challenged ordinance made "harassment" a crime if "with intent to harass, annoy or alarm another person," a person "engages in a course of conduct or repeatedly commit acts that alarm or seriously annoy another person."  1989 WL 94569, at *3-4.  The court explained that the conduct

that was prohibited by the ordinance was no less vague than the challenged statute in *Coates*, but the *Robinson* ordinance was not unconstitutionally vague because it "contains an explicit requirement of a specific intent to annoy others." *Id.* at *5. The Attorney General contends that the Michigan funeral protest statute contains a scienter requirement because it forbids a person to engage in any other conduct that the person "knows or reasonably should know" will disturb, disrupt, or adversely affect the funeral or related event.

Plaintiffs respond that "scienter by itself may not be sufficient to save the constitutionality of a statute." *Record Revolution No. 6 v. City of Parma*, 638 F.2d 916, 934 (6th Cir. 1980), vacated on other grounds, 456 U.S. 968 (1992). In *Smith*, the Court rejected the argument that the statute was saved by a state court's construction limiting its scope to intentional conduct because the construction "still does not clarify what conduct constitutes contempt, whether intentional or inadvertent." 415 U.S. at 580. Similarly, any requirement of intent to "adversely affect" a funeral does not necessarily clarify what speech or conduct may have such an impact.

Significantly, Plaintiffs have made a compelling case that the Michigan statute is unconstitutionally vague both because it does not provide ordinary people with fair warning of what conduct is prohibited and also does not provide adequate direction to law enforcement. While the cultural context of a funeral may be well understood by many, the universe of conduct that may "adversely affect" a funeral will vary widely, particularly when the term "adversely affect" is necessarily construed broader than to "disturb" or "disrupt." Additionally, the fact that the Attorney General has oscillated between suggesting that the Michigan statute prohibits conduct that adversely affects the "solemnity and procedures" of a funeral, and conduct that is "offensive" to funeral attendees, or both, underscores the ambiguity contained within the statute. While constructions of

the statute by Michigan courts, implementing regulations, and the enforcement history can be considered to narrow the scope of the statute, none of these things have been advanced and they are not believed to exist at this point in time.

Yet, in terms of qualified immunity, Plaintiffs have not carried the burden to demonstrate that it was clearly established on September 26, 2007, that the recently enacted Michigan funeral protest statute was unconstitutionally vague on its face and could not be enforced under any circumstances. In this way, the Attorney General's insistence that the statute must be considered in the context of funerals and related events is well taken. While not dispositive, it is not insignificant that the primary case law relied on by Plaintiffs does not address this particular context. Combined with the fact that the case law also does not address language highly similar to the "adversely affect" language of the Michigan statute, it is not apparent why a reasonable officer should have had a heightened sensitivity to the "adversely affects" language in this context. While Plaintiffs are quite correct that each word in the statute must be given meaning, and therefore the language "adversely affects" must mean something other than to "disturb" or "disrupt," the structure and the other subsections of the statute reasonably provide an aura of constitutionality to the statute as viewed by law enforcement, rather than the trained legal eye. Deputies Kahsin and Woodcock are entitled to qualified immunity on Plaintiffs' Fourteenth Amendment facial challenge even if the Michigan statute may be found to be unconstitutional.

However, as Plaintiffs emphasize, even if a statute is not impermissibly vague on its face, it is subject to a due process challenge when its application in a particular case "failed to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden," quoting *Palmer v. City of Euclid*, 402 U.S. 544, 545 (1971) (per curiam). Here, an ordinary person would

not understand how a law against "adversely affecting" a funeral prohibits close friends of the deceased from driving peacefully in a funeral procession simply because homemade political signs are taped to the inside windows of their car. Viewing the facts in the light most favorable to Plaintiffs, a reasonable officer could not have concluded that the statute gave the Lowdens fair notice that such conduct was forbidden. *Leonard*, 477 F.3d at 359. Notably, Deputies Kahsin and Woodcock have yet to advance any facts to undercut Plaintiffs' version of the events. Indeed, Deputies Kahsin and Woodcock elected to assert their qualified immunity defense in a motion to dismiss or for judgment on the pleadings, rather than for summary judgment, and have not suggested that facts exist that would be material to the analysis of qualified immunity. Thus, Deputies Kahsin and Woodcock are not entitled to qualified immunity on Plaintiffs' as-applied Fourteenth Amendment claim.

### 3

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const., amend. I. Underlying the overbreadth doctrine is the concern that an overbroad statute will "chill" the exercise of free speech and expression by causing " 'those who desire to engage in legally protected expression . . . [to] refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.' " *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 361 (6th Cir. 1998) (citing *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987)).

Where "there is a realistic danger of [a statute's] application against political speech, which

lies at the core of the First Amendment," it is "subject to an overbreadth challenge." *Leonardson*, 896 F.2d at 195 (quotation omitted). The United States Supreme Court recognizes that the overbreadth doctrine is "strong medicine" and, thus, employs it with hesitation, and then "only as a last resort." *New York v. Ferber*, 458 U.S. 747, 769 (1982) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). The Court has insisted the overbreadth be "substantial" in its reach before the statute involved will be invalidated on its face. *Ferber*, 458 U.S. at 769 n.24.

(a)

Under the overbreadth doctrine of the First Amendment, statutes are declared facially unconstitutional when their reach extends to prohibit a substantial amount of conduct that is protected by the First Amendment. *Grayned*, 408 U.S. at 114-15. "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). "[T]o ascertain whether the enactment reaches a substantial amount of constitutionally protected conduct," a court considers "the actual text of the statute as well as any limiting constructions that have developed." *Boos*, 485 U.S. at 329 (citing *Kolender*, 461 U.S. at 355, and *Grayned*, 408 U.S. at 110); *Forsyth*, 505 U.S. at 131.

Plaintiffs assert that the danger that the Michigan funeral protest statute will be applied against political speech is real. Plaintiffs emphasize that the Lowdens were arrested simply because the political signs on their van were suspected of "adversely affecting" a soldier's funeral. Additionally, the statute was enacted in response to "[w]idely publicized protests at funerals of soldiers killed in Iraq and Afghanistan" in an effort "to limit protests near funerals." Defs. Mot. Ex. 3 (Bill Analysis). In other words, the very purpose of the statute is to regulate "expressive activities

involving 'speech' protected by the First Amendment." *United States v. Grace*, 461 U.S. 171, 176 (1983).

The Attorney General asserts that Michigan's funeral protest statute does not proscribe a substantial amount of constitutionally protected speech in relation to the statute's plainly legitimate sweep. The Attorney General emphasizes that the statute does not regulate speech or conduct of any kind beyond the 500-foot area surrounding a funeral event. The Attorney General asserts that the 500-foot zone is a reasonable distance, especially considering that many of the events occur outdoors. Moreover, the Attorney General asserts that the statute only regulates speech or conduct that disrupts the commonly understood solemnity of a funeral event and is offensive to the participants who are emotionally vulnerable.

Plaintiffs' argument that the statute prohibits a substantial amount of protected conduct is persuasive, particularly given the vagueness of the term "adversely affects." The analysis in *Anderson v. Spear*, 356 F.3d 651 (6th Cir. 2004), is particularly applicable. In *Anderson*, the court addressed a prohibition on "electioneering" within 500 feet of a polling place. 356 F.3d at 654. While the state had a compelling interest in preventing voter intimidation and voter fraud, the court invalidated the statute and explained that "[a]ccommodating the desire of voters to completely avoid contact with anyone handing out legitimate electioneering communications is a far cry from preventing voter intimidation and voter fraud." *Id.* at 659. A state's interest based upon the fact that "many voters simply do not want to be approached on their way to the voting booth" was not sufficient to justify the prohibition on electioneering within the 500-foot zone. *Id.* at 660 ("The Supreme Court has long recognized that 'mere legislative preferences or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be

insufficient to justify such as diminishes the First Amendment rights so vital to the maintenance of democratic institutions.' ") (quoting *Schneider v. State of New York, Town of Irvington*, 308 U.S. 147, 161 (1939)).

In addressing the limits on the "right to be left alone," the court explained that "[t]he ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner." *Id.* at 661 (quoting *Cohen*, 403 U.S. at 21). While the Sixth Circuit determined in *Phelps-Roper v. Strickland*, 539 F.3d at 362-66, that individuals who are a "captive audience" have a privacy interest while attending a funeral, and that the State's interest in protecting that privacy interest justifies restrictions on protests directed at a funeral, it is not apparent that the banning of all conduct that may "adversely affect" a funeral, whether or not it is directed at a funeral or could even be considered a protest or disruptive, is justified by the State's interest in protecting that privacy interest.

(b)

A statute is also subject to an overbreadth challenge when it applies to conduct on streets and sidewalks, traditional public fora where "the rights of the state to limit expressive activity are sharply circumscribed." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983); *Boos*, 485 U.S. at 319. "The right to use a public place for expressive activity may be restricted only for weighty reasons." *Grayned*, 408 U.S. at 115. "[I]n a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for

communication of the information.' " *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

While each of the three criteria related to reasonable time, place, and manner restrictions is at issue in this case, the bulk of the parties' arguments are directed at the "content neutrality" and "narrow tailoring" requirements. First, content neutrality addresses "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791 (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 295 (1984)). "The government's purpose is the controlling consideration." *Id.* "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* (citation omitted). "Government regulation of expressive activity is content neutral so long as it is 'justified without reference to the content of the regulated speech.' " *Id.* (quoting *Cmty for Creative Non-Violence*, 468 U.S. at 293) (further citations omitted).

Second, the requirement of narrow tailoring is satisfied so long as the "regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. Yet, a "time, place, and manner" regulation is not narrowly tailored if it prohibits substantially more speech than necessary to further the government's legitimate interest. *Cleveland Area Bd. of Realtors v. City of Euclid*, 88 F.3d 382, 388 (6th Cir. 1996).

Plaintiffs contend that Deputies Kahsin and Woodcock are not entitled to qualified immunity on Plaintiffs' facial First Amendment claims because *Forsyth*, 505 U.S. at 134, and *Boos*, 485 U.S. at 321, clearly establish that the emotional impact of speech is not a content-neutral basis for regulation. Plaintiffs further assert that it is clearly established under *Frisby v. Schultz*, 487 U.S. 474, 483 (1988), and *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 775 (1994), that a "time, place, and manner" regulation is not narrowly tailored to protect a captive audience when the

-28-

law prohibits speech not directed at or unrelated to the audience it is intended to protect. Additionally, Plaintiffs assert that the unconstitutionality of a "floating" buffer zone is clearly established by *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 377-80 (1997), and the overbreadth of a buffer zone that extends 500 feet in every direction is clearly established by *Anderson*, 356 F.3d at 657-63. Finally, Plaintiffs emphasize that at the time of the Lowdens' arrest, two district courts in the Sixth Circuit had determined that particular funeral protest laws were unconstitutional under the narrow-tailoring requirement of the "time, place, and manner" test. *See Phelps-Roper v. Taft*, 523 F. Supp. 2d 612, 620 (N.D. Ohio 2007); *McQueary v. Stumbo*, 453 F. Supp. 2d 975, 992-97 (E.D. Ky. 2006).

First, Plaintiffs assert that the Michigan statute is not content neutral because it regulates speech based on the content of what is said in addition to the time, place, and manner in which the expression occurs. As previously mentioned, Plaintiffs rely primarily on *Forsyth*, 505 U.S. at 134, and *Boos*, 485 U.S. at 321. In *Forsyth*, the Supreme Court considered an assembly and parade ordinance under which the fee for a permit varied depending upon the level of police protection required for an event; and determination of the fee depended in part on "the amount of hostility likely to be created by the speech based on its content." 505 U.S. at 134 ("Those wishing to express views unpopular with bottle throwers, for example, may have to pay more for their permit."). "Listeners' reaction to speech," the Court held, "is not a content-neutral basis for regulation." *Id*. The State has no legitimate interest in restricting communications simply based on a "desire to avoid the discomfort and unpleasantness that always accompanies an unpopular view point." *Grayned*, 408 U.S. at 117. *See also Forsyth*, 505 U.S. at 134-35 ("Speech cannot be financially burdened, any more than it can be punished or banned, simply because it might offend a hostile mob."); *Boos*, 485

U.S. at 321; *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966).

Similarly, in *Boos*, the Court struck down an ordinance banning displays within 500 feet of an embassy that bring a foreign government into disrepute. 485 U.S. at 315, 319, 329. In defending the ordinance, the government argued that the ban was not content-based because its justification – protecting the dignity of foreign diplomats – was a content-neutral concern over the "secondary effects" of some kinds of speech. *Id.* at 320-21. The Court was not persuaded: "The emotive impact of speech on its audience is not a 'secondary effect.' " *Id.* at 321.

Likewise, Plaintiffs contend that the "adversely affect" clause in the Michigan funeral protest statute is not content-neutral. A person's expressive activity could easily be said to "adversely affect" a funeral solely due to the content of that person's message and its effect on others at the funeral. Plaintiffs emphasize that Defendants have already argued that they were justified in arresting the Lowdens because they were "entitle [sic] to consider the possibility of an adverse reaction by others" to the messages on the Lowdens' signs and could in fact consider the content of the Lowdens' speech in order to determine whether it would "adversely affect" the funeral. [Dkt. # 20].

In contrast, the Attorney General contends that the Michigan statute does not rely on the message being conveyed in the communication, nor does it rely on the anticipated listener's response of fear or hostility to any certain message or content. Instead, it prohibits any communication that would disturb the solemnity of the funeral event. The Attorney General emphasizes that *Boos* recognized that the special nature of the place was relevant in judging the reasonableness of any restraint. 485 U.S. at 320-21. Thus, preservation of the solemn nature of funeral events and locations is important in understanding why disruptions, regardless of the viewpoint they express,

are properly regulated.

Plaintiffs highlight that the Attorney General has previously indicated that the statute prohibits conduct that is "offensive" to funeral attendees. Indeed, as previously mentioned, the Attorney General has oscillated between stating that the statute prohibits conduct that is "offensive to the participants who are emotionally vulnerable" and that the statute prohibits conduct that would "disturb the solemnity of the event." Significantly, the Attorney General does not articulate how the content of speech is not relevant to the determination of whether it will "adversely affect" a funeral or related event. While the loud or intimidating conduct prohibited by subsections (a) and (b) of the Michigan statute do not appear to require reference to the content of speech, the "adversely affects" language cannot be rendered superfluous, *Walker*, 257 F.3d at 667, and it must be presumed that a person can "adversely affect" a funeral without actually "disrupting" or "disturbing" it because those are separate terms. Even though the Sixth Circuit found the Ohio funeral protest statute to be content neutral in *Phelps-Roper v. Strickland*, 539 F.3d at 362-66, the Ohio statute is readily distinguished because it does not prohibit speech or conduct that "adversely affects" a funeral or contain comparable language.

Plaintiffs also contend that the Attorney General conflates viewpoint discrimination with content discrimination. Regulation of speech based on content excludes a category of speech, whereas viewpoint discrimination favors a particular position. *See Boos*, 485 U.S. at 319. Even though the funeral protest statute "determines which viewpoint is acceptable in a neutral fashion" by prohibiting all speech that adversely affects a funeral, it "is nonetheless impermissible because . . . the government has determined that an entire category of speech" – that which adversely affects a funeral – "is not to be permitted." *Id.* Based on the above, it is likely that the Michigan funeral

protest statute is not content neutral.

Plaintiffs also assert that the Michigan funeral protest statute fails the "time, place, and manner" test because it is not "narrowly tailored" to serve a significant state interest. In *Phelps-Roper v. Strickland*, the Sixth Circuit concluded that there is a significant state interest in protecting funeral attendees from unwanted communication. 539 F.3d at 362-66 (analyzing Ohio's funeral protest statute). Thus, Plaintiffs only argue that the Michigan statute is not narrowly tailored because the "adversely affect" clause reaches a substantial amount of constitutionally protected expression that is not directed at or designed to interfere with a funeral.

In *Phelps-Roper v. Strickland*, the Sixth Circuit upheld Ohio's funeral protest statute in part because that law reached only "picketing" and "other protest activities" specifically "directed at" a funeral. 539 F.3d at 368. The court found the law narrowly tailored because it did not ban picketing and other protest activities that had nothing to do with the funeral. *Id*. The Michigan statute, by contrast, is not limited in this way when it makes it a crime to engage in any conduct – not just picketing and protesting – that a person should reasonably know will have an "adverse effect" on a funeral, even if that person does not intend to affect the funeral and is also actually engaged in completely unrelated expressive activity.

In *Madsen*, the Supreme Court invalidated a regulation prohibiting anti-abortion protesters from entering a 300-foot "buffer zone" around the residence of any clinic employee. 512 U.S. at 775. The restriction was not narrowly tailored, the Court held, because it effectively banned general marching through residential neighborhoods, not just picketing purposefully directed at a specific residence. *Id*. (distinguishing *Frisby*, 487 U.S. at 483). Additionally, in *Anderson*, the Sixth Circuit held that a 500-foot buffer zone around polling places was not narrowly tailored because it

prohibited political speech on private property within the buffer zone in addition to public streets and sidewalks when its purpose was to prevent voter intimidation and fraud. 356 F.3d at 662.

Plaintiffs assert that the Michigan funeral protest statute also fails the narrow-tailoring requirement because it applies a "floating buffer zone" to moving funeral processions in addition to events at fixed locations. In *Schenck*, the Supreme Court upheld a "fixed" buffer zone around an abortion clinic but struck down a "floating" buffer zone around persons and vehicles entering and leaving the clinic. 519 U.S. at 377-80. The Court reasoned that because the buffer zone floats, it would be difficult for someone who wished to engage in peaceful expressive activities to know how to stay outside the zone at all times. *Id*. at 377-78. "This lack of certainty leads to a substantial risk that much more speech will be burdened" than "necessary to serve the relevant government interests." *Id*. at 378-79. In other words, the floating buffer zones were unconstitutionally overbroad because they would cause law-abiding citizens to "steer far wider of the unlawful zone" and thereby unnecessarily chill free speech and expression. *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (quotation omitted).

In the context of funeral protest statutes, two courts have evaluated floating buffer zones and both concluded that they are unconstitutional. In *Phelps-Roper v. Taft*, the district court upheld the Ohio statute's 300-foot fixed buffer zones around funerals and burial services, but struck down the statute's 300-foot floating buffer zones around funeral processions because they were not narrowly tailored to serve the government's interest in protecting funeral attendees. 523 F. Supp. 2d at 620. The court did not include detailed analysis and that portion of the opinion was not appealed. Similarly, in *Phelps-Roper v. Nixon*, the Eighth Circuit held that Missouri's funeral protest statute was not narrowly tailored because it burdened substantially more speech than necessary to serve the

state's interest when its definition of "funeral" included funeral processions: "Its 'floating' buffer-zones . . . provide citizens with no guidance as to what locations will be protest and picket-free zones and at what times."  545 F.3d at 693.

Plaintiffs emphasize that although the Sixth Circuit has stated that there is a significant governmental interest in protecting mourners at a funeral or burial service, *see Phelps-Roper v. Strickland*, 539 F.3d at 366, the court did not address whether funeral processions are entitled to the same protection.  Notably, the court reasoned that the state's interest in protecting funeral attendees stems from their status as a "captive audience," unable to avoid objectionable speech that intrudes upon their "privacy" rights in mourning loved ones. *See id*. at 363-65.  Plaintiffs suggest that funeral processions, unlike burials and memorial services, are inherently public affairs, not private gatherings, because they travel along city streets, traditional public fora that "have immemorially been held in trust for the use of the *public*, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *Hague v. CIO*, 307 U.S. 496, 515 (1939).  Furthermore, even if those attending a funeral are a "captive audience" vis-à-vis unwanted communicators who descend upon a fixed location, the same cannot be said of participants in a moving funeral procession that winds its way along public streets, instantly criminalizing whatever unwanted or objectionable stationary speech that happens to be within 500 feet of its path.

Plaintiffs also contend that the Michigan statute is unconstitutional because the size of its buffer zone – 500 feet in all directions from a procession – is far larger than necessary to serve the relevant state interests.  In *Phelps-Roper v. Strickland*, the Sixth Circuit upheld a 300-foot buffer zone, but that applied only to protests specifically directed at a funeral and did not apply to moving

-34-

funeral processions. 539 F.3d at 367-68. In the context of election-day restrictions near polling places, the Sixth Circuit rejected a 500-foot buffer zone. *See Anderson*, 356 F.3d at 657-63. In *Anderson*, the size of the buffer zone was of critical importance:

> We need only consider how large Kentucky's 500-foot barrier is to recognize the degree to which the restriction impinges on free speech. At first blush, this buffer zone might appear to be five times as large as the 100-foot buffer zone [upheld] in *Burson* [*v. Freeman*, 504 U.S. 191 (1992)] – an expansion which alone might generate concern. But such a calculation fails to take into account the fact that the buffer zone runs in all directions from the building. Therefore, the buffer zone . . . covers an area 25 times larger than the area at issue in *Burson*. The regulation has the potential to silence constitutionally protected speech for 18 acres around a voting booth, and guarantees that those wishing to express their opinions about the election are prohibited from coming within the length of 1 and 2/3 football fields of the polling place.

*Id*. at 661. "The geographic scope of this regulation alone raises constitutional concerns." *Id*. at 661.

The Attorney General asserts that the statute is narrowly tailored to serve what it characterizes as "the important interest in the protection of funeral and burial rite attendees" and "preserving the solemnity of funeral events and in protecting attendees from the harmful psychological effects of unwelcome communication when they are most captive and vulnerable." The Attorney General asserts that the statute is "location specific" because it only prohibits "certain specified communication" at a building or location where a funeral, memorial service, viewing, funeral procession, or burial is held. The Attorney General asserts that the "specified communication" is prohibited only while one of these events is "being conducted," and not before or after the event.

The Attorney General asserts that the Michigan statute specifies the kinds of speech and conduct that will be prohibited within the 500-foot buffer zone: loud and raucous noise that an individual will not cease when asked (subsection (a)); statements or gestures that would make a

reasonable person under the circumstances feel intimidated, threatened, or harassed (subsection (b));

and conduct that the person knows or should reasonably know will disturb, disrupt, or adversely

affect the funeral, memorial service, viewing, or burial (subsection (c)).  The Attorney General

submits that this distinguishes the current case from *Anderson*, in which the court invalidated a

Kentucky statute as overbroad because evidence provided by the State suggested "that the buffer

zone was intended to cut off *all* electioneering speech," within 500 feet of polling places, rather than

simply prevent voter intimidation and fraud.  356 F.3d at 659, 661.

Finally, the Attorney General asserts that the 500-foot buffer zone around both a funeral and

funeral procession is reasonable, given the nature of the events, their frequent location outdoors, and

the large crowds they often attract.  As the Sixth Circuit recognized in *Phelps-Roper v. Strickland*

when it compared the 300-foot buffer of Ohio's funeral protest statute with the 100-foot buffer zones

in other contexts:

> [G]iven that numerous mourners usually attend a funeral or burial service, the size of a
> buffer zone necessary to protect the privacy of an entire funeral gathering can be expected
> to be larger than that necessary to protect the privacy of a single residence or a single
> individual entering a medical clinic.  Moreover, a 300-foot buffer zone takes account of the
> logistical problems associated with moving large numbers of people from the site of a
> funeral to the burial site.

539 F.3d at 371.  The Attorney General asserts that a larger buffer zone is justified in the funeral

context, as opposed to the home, *Hill v. Colorado*, 530 U.S. 719 (2000), a medical clinic, *Madsen*,

512 U.S. 753, a park, *Ward*, 491 U.S. at 796, or a polling place, *Anderson*, 356 F.3d at 551, because

disruptions around a funeral event jeopardize the very purpose of the event – to pay respects to the

deceased, to mourn and grieve in a solemn setting.

With particular attention to funeral processions, the Attorney General argues that unlike in

*Schenck*, 519 U.S. at 378-379, the floating buffer zone is not difficult to ascertain because the

-36-

passing of a funeral procession is a predictable, easily recognizable, and readily understood event that occurs for only a brief period of time. The Attorney General acknowledged at the hearing that the 500 foot restriction would logically apply to each car in the procession. The Attorney General asserts that here, the 500-foot buffer zone around the funeral procession is necessary to ensure the very purpose of the funeral event – to allow expressions of respect, grief, and mourning without disruption. In contrast, Plaintiffs emphasize that funeral processions travel along city streets, typically without providing advance warning to citizens going about their business.

Based on the above, it is likely that the Michigan funeral protest statute is not narrowly tailored. First, the "adversely affect" clause likely restricts substantially more speech than necessary to protect funeral attendees, as a captive audience, from having their privacy interests invaded. Likewise, the justification for a 500 foot buffer zone, especially applied to every vehicle in a funeral procession, is questionable when it extends in every direction. Perhaps more importantly, the interaction of the 500 foot buffer zone and the "adversely affects" language is particularly problematic given the broad scope of expressive activity restricted in such a large space.

The parties have also briefly addressed whether the Michigan statute leaves open ample alternative channels for communication. In *Phelps-Roper v. Strickland*, the Sixth Circuit held that Ohio's funeral protest statute left open ample alternative channels for communication because would-be funeral protesters were free to communicate their message outside the buffer-zone areas and could express their views on a web site. 539 F.3d at 372-73. Plaintiffs emphasize, however, that the Ohio statute, unlike the Michigan statute, applies only to picketing and protests actually directed at a particular funeral. Plaintiffs assert that the Ohio statute's restrictions on funeral protests mirrors the ordinance protecting residential privacy in *Frisby*. In *Frisby*, the Supreme Court

explained that because protestors were permitted to engage in expressive conduct in residential neighborhoods short of targeting a particular house, "the general dissemination of a message" was not proscribed and "ample alternatives remain." 487 U.S. at 483-84. The Michigan statute, by contrast, prohibits any conduct adversely affecting a funeral. The "general dissemination of a message" that adversely affects a funeral, therefore, is totally banned, and no ample alternatives remain.

The Attorney General asserts that the statute leaves open ample alternative channels of communication because it does not silence demonstrators during the viewing, funeral or burial service by requiring them to stay 500-feet away. Individuals may still communicate in any way they please outside the buffer zone. It is likely that the statute does not leave open ample alternatives for communication given the breadth of the "adversely affects" language and size of the buffer zone.

Although it is likely that the Michigan funeral protest is unconstitutionally overbroad on its face in violation of the First Amendment, Plaintiffs have not carried the burden to demonstrate that it was clearly established on September 26, 2007, that the recently enacted Michigan funeral protest statute was unconstitutionally overbroad on its face and could not be enforced under any circumstances. While the Ohio statute upheld in *Phelps-Roper v. Strickland* does not contain the same "adversely affect" language of the Michigan statute and only applies to an area within 300 feet of a funeral, that does not mean it is clearly established that a statute that is any broader is unconstitutional. Plaintiffs have not advanced cases addressing language comparable to "adversely affect" or a 500-foot buffer zone in the funeral context. As under the Fourteenth Amendment, the trained legal eye may be able to determine that the statute is unconstitutionally overbroad, but the dissimilarities of both context and specifics in the case law cited by Plaintiff as compared to the

Michigan statute prevent it from being clearly established as unconstitutional through the eyes of a reasonable law enforcement officer. Thus, Deputies Kahsin and Woodcock are entitled to qualified immunity on Plaintiffs' First Amendment facial challenge, even if the Michigan statute may be found to be unconstitutional.

In contrast, Deputies Kahsin and Woodcock are not entitled to qualified immunity on Plaintiffs' as-applied First Amendment claims. They contend that they are entitled to qualified immunity on Plaintiffs' First Amendment claims because Plaintiffs have not alleged any facts to support a retaliation theory, that is, that the Lowdens' constitutionally-protected conduct was a "motivating factor" behind the government's actions, citing *Adair v. Charter County of Wayne*, 452 F.3d 482, 492 (6th Cir. 2006). In addition, Deputies Kahsin and Woodcock contend that Plaintiffs have not alleged specific facts suggesting that Deputies Kahsin and Woodcock harbored a particular retaliatory animus or established a "causal connection" linking any animus to a constitutional injury, citing *Hartman v. Moore*, 547 U.S. 250, 262 (2006).

In support of both of these arguments, Deputies Kahsin and Woodcock take the position that they were entitled to consider the content of the Lowdens' speech to determine that the arrests were permissible under the "adversely affect" language of the Michigan statute, citing *Hill*, 530 U.S. at 721 ("It is common in the law to examine the content of a communication to determine the speaker's purpose. . . .We have never held, or suggested, that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct."). Specifically, the *Hill* Court explained that the Court has "never suggested that the kind of cursory examination that might be required to exclude casual conversation from the coverage of a regulation of picketing would be problematic." *Id.* at 722.

Plaintiffs contend that law enforcement officers violate the First Amendment when they enforce a facially neutral statute based on the content of a person's speech, citing *Logsdon v. Hains*, 492 F.3d 334, 346 (6th Cir. 2007), and *Swiecicki v. Delgado*, 463 F.3d 489, 501 (6th Cir. 2006), abrogated on other grounds by *Wallace v. Keto*, 549 U.S. 384 (2007). Plaintiffs contend that Deputies Kahsin and Woodcock targeted the Lowdens based on the content of their speech and emphasize the following facts: The Lowdens were driving slowly and peacefully from the church to the burial site as part of the funeral procession. No one complained about the Lowdens' van, and it caused no noticeable disturbance or disruption of the funeral procession. The funeral flag on the van indicated that they were invited guests. Many people along the procession route waved American flags and displayed their own signs thanking Corporal Motley for his service to this country, without incident. It was only when police learned that the Lowdens' van displayed anti-government protest signs that the Lowdens were stopped. Deputy Kahsin, despite having no information that the Lowdens were causing any trouble, immediately questioned them about the signs in their van. Despite the Lowdens' insistence that they had been invited to the funeral and were not there to protest, Deputies Kahsin and Woodcock placed them under arrest.

Plaintiffs also assert that "First Amendment law soundly rejects the 'heckler's veto.' " Plaintiffs contend that a peaceful expression of a political opinion cannot be suppressed merely because others "unprovoked by the fact of the constitutionally protected demonstration itself, . . . might react with disorder or violence," quoting *Brown*, 383 U.S. at 133 n.1. As an example, Plaintiffs rely on *Glasson v. City of Louisville*, in which the court held that police officers could not confiscate and destroy a peaceful demonstrator's sign criticizing the President simply because it "unintentionally evoked a hostile reaction from others." 518 F.2d 899, 905 (6th Cir. 1975).

Plaintiffs also contend that the Lowdens' conduct cannot be construed as "fighting words," because they were political statements, not personal insults directed at anyone present at Corporal Motley's funeral, and not inherently likely to provoke an immediate violent reaction. Finally, Plaintiffs contend that the Supreme Court has rejected the view that the content of the speech can be considered when the motivation is purportedly a "content-neutral" desire to prevent an "adverse affect." *See, e.g.*, *Boos*, 485 U.S. at 321.

Plaintiffs contend that Deputies Kahsin and Woodcock are not entitled to qualified immunity because the Lowdens' First Amendment rights were clearly established when the facts alleged in the complaint are viewed in the light most favorable to Plaintiffs. In *Logsdon*, the Sixth Circuit explained that "[i]t has long been the case that content-based regulations of the citizen's right to engage freely in speech in quintessential public fora presumptively violate the First Amendment." 492 F.3d at 346. In other words, Deputies Kahsin and Woodcock are not entitled to qualified immunity because they were on notice that content and viewpoint based suppression of speech is unlawful, that they could not arrest a speaker based on a potential "heckler's veto," and that no reasonable officer in Deputy Kahsin or Woodcock's position would have thought Plaintiffs' conduct qualified as "fighting words." As previously noted, Deputies Kahsin and Woodcock elected to assert their qualified immunity defense in a motion to dismiss or for judgment on the pleadings, rather than for summary judgment, and have not suggested that facts exist that would be material to the analysis of qualified immunity. Plaintiffs' arguments are compelling, and Deputies Kahsin and Woodcock are not entitled to qualified immunity on Plaintiffs' as-applied First Amendment claims.

B

Plaintiffs contend that this Court should declare that the Michigan funeral protest statute is invalid under both the void for vagueness doctrine of the Due Process Clause of the Fourteenth Amendment and the overbreadth doctrine of the First Amendment. Plaintiffs assert that the Court's power to enter declaratory relief derives from the Declaratory Judgment Act, 28 U.S.C. § 2201(a): "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." Plaintiffs contend that the Court should exercise its discretion to provide declaratory relief because doing so would "serve a useful purpose in clarifying the legal relations at issue" by "putting the public on notice" that a given practice or statute is unconstitutional. *Hanas v. Inner City Christian Outreach, Inc.*, 542 F. Supp. 2d 683, 693 (E.D. Mich. 2008).

Yet, "[c]laims of facial invalidity often rest on speculation. As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records." *Phelps-Roper v. Strickland*, 539 F.3d at 361 (citations omitted). Facial challenges also "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (citation and quotation omitted). Too, "facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.*

It is not insignificant that here, the state courts have not had an opportunity to adopt a

construction that would narrow the Michigan statute in a way that would avoid constitutional problems. Moreover, when the parties' papers were filed, it was not apparent that Plaintiffs would not be able to pursue facial challenges of the Michigan statute against Deputies Kahsin and Woodcock. In light of the resolution of Plaintiffs' facial challenges to the statute on the basis of qualified immunity, it appears that the Court may not appropriately reach the question of whether the Michigan statute is unconstitutional on its face. Thus, the Court will invite the parties to brief the issue of whether the Court should exercise discretion to reach the issue.

## C

The County contends that Plaintiffs have failed to allege a facially plausible municipal liability claim against it under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978). Pursuant to *Monell*, a plaintiff suing a unit of local government, such as a county, must identify an unconstitutional policy or custom in order to prevail on a § 1983 claim against it. *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997) ("[W]e have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."). A single act by a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action ordered" may suffice in demonstrating that policy or custom. *Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986).

The County contends that Plaintiff's complaint does not contain any facts that support the existence of an official "policy, custom, or practice" of the County other than a "policy" of enforcement of state law. The County contends that an arrest, or any injury, under a Michigan statute is necessarily part of a policy of the State of Michigan, rather than any "policy" devised or adopted by the County. The County quotes *Pusey v. Youngstown*, for the proposition that "state

criminal laws . . . represent the policy of the state.  Thus, a city official pursues her duties as a state agent when enforcing state law or policy."  11 F.3d 652, 657 (6th Cir. 1994).

As an example, the County cites *Surplus Store & Exchange, Inc. v. City of Delphi*, 928 F.2d 788 (7th Cir. 1991).  There, the Seventh Circuit rejected the plaintiff's argument that the city could be liable based on a " 'policy' of enforcing state law."  *Id.* at 791-92.  The court explained, "It is difficult to imagine a municipal policy more innocuous and constitutionally permissible, and whose causal connection to the alleged violation is more attenuated, than the 'policy' of enforcing state law."  *Id.*  The County further relies on, and quotes, another Seventh Circuit case, for the proposition that "[w]hen the municipality is acting under compulsion of state or federal law, it is the policy contained in the state or federal law, rather than anything devised or adopted by the municipality, that is responsible for the injury."  *Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716, 718 (7th Cir. 1998).

The County emphasizes that Plaintiffs have not identified any prior incidents of police misconduct, inadequacies in the training, supervision and discipline of deputies, or prior instances where another citizen's constitutional rights have been violated.  The County contends that, as here, "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation," quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985) (plurality) (footnote omitted).

In response, Plaintiffs emphasize that a municipal "policy" need not be a written ordinance, but may be a "statement" or "decision" by a municipal official, such as a county sheriff or city police chief "whose edicts or acts may fairly be said to represent official policy."  *Monell*, 436 U.S. at 690,

694; *see also Pembaur*, 475 U.S. at 482. Plaintiffs characterize the relevant question as "whether individual officers were acting entirely on their own in arresting the Lowdens for allegedly protesting Corporal Motley's funeral . . . or whether they were acting instead pursuant to a municipal policy to make arrests of that nature."

Plaintiffs contend that the factual allegations in the complaint meet the "plausibility" standard of *Iqbal*, 129 S. Ct. at 1949. Based on the factual matter contained in Plaintiff's complaint, Plaintiffs contend that the following inferences are reasonably warranted:

> First, because Corporal Motley's funeral procession was a planned, highly publicized event on the streets of a small town, it did not escape the notice and attention of persons whose edicts or acts may fairly be said to represent official policy. Second, in light of highly publicized protests at the military funerals of other American soldiers who had died in Iraq and the Michigan Legislature's enactment of a statute designed to prevent such protests, policymakers determined that anyone who protested the funeral and procession of Corporal Motley should be stopped and arrested. Third, that decision, followed by instructions implementing it, was the "moving force" behind the Lowdens' arrest on September 26, 2007. *Monell*, 436 U.S. at 694.

[Dkt. # 23]. Plaintiffs contend that "it is virtually inconceivable that sheriff's deputies directing traffic in Clare County would just happen to be aware of [the funeral protest statute], and be prepared to make an arrest based on an alleged violation of that statute, unless county officials had instructed them to be on the lookout for such violations and to make such arrests." *Id.*

Plaintiffs also contend that the County is liable pursuant to § 1983 because enforcement of the Michigan funeral protest statute is discretionary and the County exercised its discretion to enforce it, citing *Garner v. Memphis Police Dep't*, 8 F.3d 358 (6th Cir. 1993), and *Brotherton v. Cleveland*, 173 F.3d 552 (6th Cir. 1999). Plaintiffs contend that a violation of the funeral protest statute is a felony, and under Michigan law, "a peace officer, without a warrant, may arrest a person" who commits a felony "in the peace officer's presence," quoting Mich. Comp. Laws § 764.15.

Plaintiffs emphasize that the term "may" is discretionary, unlike "shall," which is mandatory. Thus, Plaintiffs contend that an officer is not required to arrest an individual who violates the funeral protest statute, and that Clare County made a deliberate policy decision to enforce the statute in the way that it did.

Plaintiffs contend that *Surplus Store* did not involve a policy decision made by a municipality or high-ranking official. Plaintiffs contend that the Seventh Circuit has embraced the Sixth Circuit's distinction "between the state's command (which insulates the local government from liability) and the state's authorization (which does not)." *Bethesda Homes*, 154 F.3d at 718. Plaintiffs also distinguish *Pusey* because the plaintiff did not allege the existence of a municipal policy. 11 F.3d at 657. Plaintiffs contend that *Cady v. Arenac County*, 574 F.3d 334, 343-44 (6th Cir. 2009), confirms that *Pusey* applies only to an individual act by a county prosecutor enforcing state law, whereas *Brotherton* and *Garner* govern cases involving municipal policy choices that result in a law enforcement act.

Defendants contend that *Garner* and *Brotherton* are distinguishable because the decisions involved "official policies" or "policy decisions" that were developed on the basis of a state statute authorizing action, as opposed to discretionary acts authorized by state law by persons without final policy making authority. In other words, municipal liability was traceable to some discretionary decision by the municipality itself, rather than employees who were merely enforcing state law. Defendants contend that the discretion in this case lies with the individual officers and that Plaintiffs have not alleged anything to plausibly suggest that there was conduct on the part of a high-ranking official that could constitute a policy statement or decision.

Despite the County's attempt to characterize Plaintiffs' claims otherwise, Plaintiffs contend that the Lowdens' arrests were the result of a policy choice made by the an appropriate official of

the County to enforce the funeral protest statute through specific instructions to law enforcement in advance of the funeral. Plaintiffs contend that the County is liable for that policy even if it happens to be consistent with a state law. On that basis, and the reasonable inferences that can be drawn from the facts alleged in the complaint, its is plausible that Plaintiffs may be able to develop facts to demonstrate the actual existence of a municipal policy. Thus, Plaintiffs' claims for municipal liability survive Defendants' motion to dismiss or for judgment on the pleadings.

IV

Accordingly, it is **ORDERED** that Defendants' motion to dismiss or for judgment on the pleadings [Dkt. # 20] is **GRANTED IN PART** and **DENIED IN PART**.

It is further **ORDERED** that Plaintiffs' motion for partial judgment on the pleadings [Dkt. # 31] is **DENIED IN PART** and **DENIED WITHOUT PREJUDICE IN PART**.

It is further **ORDERED** that the Attorney General's motion for summary judgment [Dkt. # 39] is **DENIED WITHOUT PREJUDICE**.

It is further **ORDERED** that the parties are **GRANTED LEAVE** to file supplemental briefing on the issue of whether the Court should consider Plaintiffs' request for declaratory relief and reach the questions regarding the facial constitutionality of the Michigan funeral protest statute in light of the current posture of the case. Should Plaintiffs wish to continue to pursue declaratory relief, their brief shall be filed on or before **April 14, 2010**. Any response by the Attorney General or Defendants shall be filed on or before **May 5, 2010**. Any replies shall be filed on or before **May 14, 2010**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: March 26, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 26, 2010.

s/Tracy A. Jacobs
TRACY A. JACOBS